Gregory L. FREEMAN and Helen Freeman, Plaintiffs and Counterclaim Defendants,

v.

UNITED STATES Of America, Defendant and Counterclaimant,

v.

Jerry G. TAYLOR, Counterclaim Defendant.

No. CIV 83–2141 PCT EHC.

United States District Court, D. Arizona.

Feb. 14, 1985.

Philip J. Shea, Phoenix, Ariz., for Freemans.

Brad S. Ostroff, Burch & Cracchiolo, Phoenix, Ariz., for Taylor.

Jack H. Kindsvatter, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## ORDER

CARROLL, District Judge.

Gregory L. Freeman and Helen S. Freeman, husband and wife, filed this action to recover a partial payment of $846.00 made on a 100 percent penalty assessment against Gregory L. Freeman (Freeman) of $48,960.97. The assessment related to unpaid income tax withholding and social security taxes owed by Pueblo Builders & Developers, Inc., (Pueblo), for the quarters ending December 31, 1978 and March 31, 1979. Freeman was a Vice-President and Director of Pueblo during the periods in question.

The assessment against Freeman, as well as like assessments against Fred H. Steele and Jerry G. Taylor, two other officers of Pueblo, were made February 2, 1982, under §§ 6671 and 6672 of the Internal Revenue Service Code of 1954, based on their association with Pueblo.

The Government counterclaimed against Freeman and Jerry G. Taylor (Taylor) to recover a judgment for the assessment amount.

Taylor replied to the counterclaim alleging as affirmative defenses that he was neither a person required to collect, account for, and pay over the income tax withholdings and social security taxes owed by Pueblo nor did he exercise (or have the authority to exercise) any control over the use of the corporation's funds and the payment of creditors.

On February 7, 1985, the day of the trial, the Government stipulated to entry of judgment that Freeman recover his partial payment. The case proceeded to trial against Taylor. The record reflects the following events:

Pueblo was incorporated in March, 1977 to engage in the construction business. It was organized with a Hopi Indian, Wayne P. Sekaquaptewa ostensibly having a majority interest in the corporation. Under federal legislation this would allow a bidding preferential for construction projects on Indian reservations.

Other incorporators included Steele, Richard Mayo, Bob J. Barker, Gregory L. Freeman and James W. Martin. Mayo, and Martin appear to have had little involvement in company activities. Barker resigned as vice president in early 1978, since he was the only officer not receiving a salary. Barker did participate as a director after his resignation as an officer. Sekaquaptewa was President and Chairman of the Board of Directors. Steele and Freeman were Vice Presidents and members of the Board of Directors. Freeman was the qualifying party on Pueblo's contractor's license.

The corporate offices were located in Camp Verde, Arizona. Taylor, who lived in Camp Verde, was employed in the spring of 1977 at an annual salary of $18,000, as an accountant or bookkeeper, while keeping his general accounting clientele. By October 19, 1977, he was a full time employee; he was Treasurer and a corporate director. On that date the Board authorized the issuance to him of 40 shares (4%) of the capital stock. He was issued an additional 40 shares of stock at a Board meeting on November 1, 1977.

Freeman, Taylor, Barker and Nancy Parsons, secretary with the company between mid-1978 and late 1979, testified that Steele ran the company; negotiated bids; signed all the contracts; decided who would be paid, etc. Sekaquaptewa was only a figurehead; Freeman was the construction su-

perintendent and did the estimating; and Taylor paid bills as directed by Steele.*

There is no documentary evidence which supports the opinions expressed by the witnesses called by Taylor, regarding the extent of Steele's control over the corporation or its financial operations.

Freeman and Taylor testified that Taylor presented monthly financial reports at directors meetings. During the relevant times, these reports reflected the delinquent corporate tax liabilities to the Government. Steele would state that these liabilities would be satisfied out of future draws—and the Board either did nothing— or agreed with Steele to defer paying the taxes. The available funds would then be used to pay corporate salaries, employees and trade accounts.

Taylor testified that he would prepare and sign checks payable to the IRS for these liabilities and Steele would direct him not to mail the checks with the tax reports. At these times, Taylor was an authorized signatory on the bank accounts, and he could have signed and mailed the checks to the IRS. He did not do so. When asked why, he replied that had he done so, Steele would have terminated his employment with Pueblo.

It is clear that Taylor participated in management activities of the company during the time periods at issue by corresponding with architects, contracting parties, and governmental agencies, including the IRS. He signed all checks as a single signatory during the last quarter of 1978 and the first quarter of 1979. He also attended board of directors meetings where the corporation's delinquent tax liabilities were discussed. Taylor testified that he told Steele the IRS would close the doors if it wasn't paid something on account. Steele then told Taylor to make sufficient payments to keep the doors open. Taylor then made periodic payments to the IRS. IRS

notices to Pueblo were directed to Taylor and he is the only one who dealt with IRS.

In early 1979, Taylor guaranteed a corporate bank loan of $10,000. The proceeds of this loan were used to meet payroll obligations. The loan was repaid from corporate funds prior to March 31, 1979 in preference to paying tax obligations. Taylor guaranteed the loan because the bank refused to accept Steele's guaranty.

Although Taylor's salary terminated July 31, 1979, he remained a corporate officer and director until he filed a bankruptcy petition on behalf of Pueblo on December 12, 1979. He testified that he filed the petition at the direction of Sekaquaptewa's widow.**

ISSUES TO BE RESOLVED:

1. Was Taylor a person required to collect, truthfully account for and pay over employment taxes?

and if so,

2. Did he willfully fail to pay over the trust fund taxes?

There are numerous reported decisions which have decided similar issues under the facts and circumstances presented in each case. While the result is determined by the evidence presented in each case, certain general legal principles are applicable in any case.

■ Before a person can be held personally liable for unpaid corporate withholding and FICA taxes, he must have a responsibility to collect and pay over those taxes. This responsibility is not necessarily exclusive to one person. *United States v. Graham*, 309 F.2d 210, 212 (9th Cir.1962).

■ Liability is not necessarily imposed on a corporate officer simply because of his office. In ordinary circumstances, the treasurer of a corporation does have responsibility for collection and payment of taxes. Taylor, as treasurer, had responsibility for performing the clerical duties of collecting the taxes, preparing the returns

* Sekaquaptewa died in the late summer of 1979. Steele died December 11, 1983.

** Taylor submitted his resignation effective June 30, 1979, under date of April 23, 1979. However, he continued on after that date because of concerns about any personal liability he had for corporate activities.

and paying over the taxes. His defense regarding his failure to collect and pay over the taxes—he did prepare and file the 941 forms—is that he did not have authority to do so because of orders from Steele (or the board of directors).

The facts do not support Taylor's plea that he acted only in a clerical capacity and had no say in the policy making processes of the company.

He regularly prepared financial statements of the company and submitted them to the board of directors. These reports disclosed the delinquent tax obligations at issue.

He was a member of the board of directors and went along with board decisions to defer payment of these tax obligations.

He met with a representative of IRS during relevant times to discuss tax delinquencies and he negotiated payments which allowed the company to continue operations.

He guaranteed a corporate loan of $10,000 in the fall of 1978 or in early January, 1979. He caused this loan to be repaid in preference to delinquent tax obligations.

He dealt with architects, contracting parties, and HUD—Office of Indian Programs, during January, February and March, 1979 regarding Pueblo projects.

He was singly empowered to sign corporate checks. Pueblo had sufficient funds during the last quarter of 1978 and the first quarter of 1979 to pay withholding and FICA obligations. He had the effective power to pay the taxes.

He did not pay the taxes, believing that if he did so, he would have been fired by Steele.

Steele was optimistic that Pueblo's financial position would improve and it would be able to bring its tax obligations current.

█ Taylor's ultimate argument is that he was ordered not to pay the taxes and that had he done so, Steele would have fired him. Thus, he contends he was not authorized to pay these taxes and did not willfully fail to pay them.

Taylor principally relies (Post-Trial Brief, p. 5) on an opinion of a district judge in the Northern District of Alabama, *Roth v. United States*, 53 A.F.T.R.2d 84–1153 (N.D.Ala.1984). That Court held, in granting the taxpayers' motion for summary judgment, that a corporate officer lacks authority to pay taxes and is not a responsible party where a superior officer orders that the withheld funds be used to pay other creditors.

The Alabama court discussed and refused to follow a contrary viewpoint expressed in *Howard v. United States*, 711 F.2d 729 (5th Cir.1983). In my judgment, the *Roth* decision is bad law and I reject its reasoning and conclusion. In researching *Roth* it developed that the opinion was subsequently vacated on motion of the government and the case proceeded to trial.

As the Court noted in *Howard:*

> The fact that Jennings might well have fired Howard had he disobeyed Jennings'' instructions and paid the taxes does not make Howard any less responsible for their payment. . . . However, as we have already noted in our analysis of Howard's status as a 'responsible person', Howard had a choice. He could have paid the taxes, accepted the consequences, and thus avoided the penalty. Neither his discomfort over not paying the taxes, nor his desire to see them paid, makes his failure to pay any less willful. . . .

711 F.2d 729, at 734. See also: *In Re Turner*, 35 B.R. 811. (Bkrtcy.N.D.1983).

I find and conclude, for the reasons stated previously:

1. This Court has jurisdiction pursuant to Title 28 U.S.C. Sections 1340 and 1345, and Title 26, U.S.C. Section 7402;

2. Jerry G. Taylor was a person required to collect, truthfully account for, and pay over the withholding and FICA taxes due and owing from Pueblo Builders & Developers, Inc. for the fourth quarter of 1978 and the first quarter of 1979;

3. Jerry G. Taylor willfully failed to pay over trust fund taxes due and owing the government for the two quarters at issue;

4. The assessment against Jerry G. Taylor is not erroneous.

The foregoing Opinion in its entirety constitutes the findings of fact and conclusions of law in this proceeding.

Accordingly, IT IS ORDERED that the Government shall, prior to March 1, 1985, lodge with the Court and serve on the attorney for Jerry G. Taylor, a form of Judgment setting forth the amounts owed to the Government, including principal and interest to February 28, 1985, and the amount of daily interest thereafter.

IT IS FURTHER ORDERED that objections, if any, to the form of Judgment shall be filed on or before March 15, 1985.